UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
at LOUISVILLE

CIVIL ACTION NO. 3:10-CV-108-KSF

COURTNIE PRUITT, et al.                                                                 PLAINTIFFS

vs.                                     **OPINION AND ORDER**

JAMES HABIB, et al.                                                                      DEFENDANTS

\* \* \* \* \* \* \* \*

This matter is before the Court on the motion of the United States to dismiss the constitutional claims against Deputy United States Marshals Ioos ("Ioos") and Habib ("Habib") under the doctrine of qualified immunity [DE 18] and Plaintiffs' motion to permit discovery [DE 33]. The motion to dismiss was converted to one for summary judgment. For the reasons stated below, the motion of the United States for partial summary judgment will be granted in part and denied in part, and the motion to permit discovery will be granted in part.

I.     **BACKGROUND**

Plaintiffs brought this civil rights action pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unnamed Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against two United States Marshals (Defendants Ioos and Habib) and Louisville Metro Police Officer ("LMPD") Brian Kuriger. [DE 1]. Plaintiffs asserted federal Constitutional claims by alleging that the conduct of the officers involved an unreasonable seizure and search, excessive use of force, and malicious prosecution. Plaintiffs further alleged under state law that the officers' conduct constituted assault, battery, intentional infliction of emotional distress, unlawful imprisonment, and malicious prosecution. [*Id.*].

Plaintiffs' state law tort claims were dismissed without prejudice so their remedies could be exhausted under the Federal Tort Claims Act. [DE 25]. The United States was substituted as a

party for Deputies Habib and Ioos. [DE 16]. The United States' motion to dismiss was converted to one for summary judgment and has been fully briefed. [DE 29, 32].

In support of the motion to dismiss, the United States provided the Declarations of Deputies Habib and Ioos. [DE 18-2, 18-3]. Their memorandum also included photographs of a suspect fugitive and Plaintiff Marcus Brewer [DE 18-1 at 3] and a schematic of the locations of the relevant vehicles at the Thornton's service station [DE 18-1 at 5]; however, these items were not identified in the sworn statements. Habib and Ioos stated they were participating as members of the Western Kentucky Fugitive Task Force ("Task Force") in Louisville, Kentucky, on February 13 and 14, 2009, and had received information that an individual from Chicago, Illinois, with an outstanding arrest warrant for felon in possession of a firearm, was in Louisville. [Habib Declaration ¶¶ 2-3]. They were advised that the fugitive had "an open arrest warrant from LMPD for a Felony Offense Probation Violation; was a person of interest in several homicides with LMPD; had an open investigation by the Bureau of Alcohol, Tobacco, Firearms and Explosives; had a history of involvement with drug trafficking and firearms; a prior federal escape investigation; and was considered to be armed and extremely dangerous." *Id.* at ¶ 2.

Based on electronic surveillance, the Task Force had specific information that the fugitive had been detected south of the Fair Grounds, near Preston Highway, in Louisville. *Id.* at ¶ 4. Based on the investigation, the Task Force suspected the fugitive would be driving a rental car, might have his girlfriend with him, and was staying in a hotel. *Id.* Late in the evening of February 13, Deputy Habib was riding with LMPD Detective Kuriger in an unmarked minivan as they searched for the fugitive. *Id.* at ¶ 5. Detective Kuriger was driving the van. [Ioos Declaration ¶¶ 5-6]. They had updated surveillance information that the fugitive might be in the vicinity of the Ramada Inn on Crittenden Drive. [Habib Declaration ¶ 5]. They were driving through various hotel parking lots when, at the Ramada Inn, Detective Kuriger identified the driver of a Chrysler Sebring as the suspect fugitive. *Id.* at ¶ 6. Kuriger was familiar with the suspect from Kuriger's role in the

2

LMPD homicide cases. *Id.* Deputy Habib thought the Sebring driver matched the suspect's photograph that they had been provided. *Id.* A female passenger accompanied the suspect in the Sebring. The Sebring drove to another hotel near the Ramada, but the occupants remained in the vehicle. LMPD confirmed that the Sebring was registered to a rental car company. *Id.*

Soon, Deputy Ioos joined the Task Force and waited at a Thornton's Gas Station on Crittenden Drive to obtain the fugitive's photograph and assist in the search for him. [Ioos Declaration at ¶ 3; Habib Declaration at ¶ 7]. Deputy Ioos was driving an unmarked black Chevrolet Suburban. [Ioos Declaration at ¶ 3]. As Detective Kuriger proceeded toward the gas station, Deputy Habib saw the Sebring pull into a Budget Car Rental lot. [Habib Declaration at ¶ 7]. Based upon their observations that matched the known activities of the fugitive, Detective Kuriger and Deputy Habib suspected the driver of the Sebring was the fugitive and decided to stop the Sebring and question its occupants. *Id.* at ¶ 8.

Kuriger and Habib met Ioos in the Thornton's parking lot and gave him the picture of the fugitive. [Habib Declaration at ¶ 9; Ioos Declaration at ¶ 4]. While there, Kuriger and Habib saw the Sebring leave the Budget Rental parking lot to pull into the Thornton's Gas Station and park, but no one left the vehicle. [Habib Declaration at ¶ 10].

Detective Kuriger moved his vehicle to position it partially in front of the Sebring, while Deputy Ioos began to position his vehicle on the other side of the Sebring. *Id.* Based upon the vehicles' positioning described by Marcus Brewer, Kuriger and Habib were in the van on the passenger side of the Sebring and Ioos' Suburban was on the Sebring's driver's side. [DE 32-2 at ¶ 5]. Deputy Habib left his vehicle and approached the Sebring from the front. He was wearing plain clothes with his U.S. Marshal's badge hanging from around his neck. [Habib Declaration at ¶ 11]. Deputy Habib said he yelled, "Police, let me see your hands!" As Habib approached the Sebring, he could see its brake lights reflecting off the side of the gas station and realized the driver was shifting the vehicle from Park to Drive. [*Id.* at ¶ 12]. Deputy Habib drew his weapon and

pointed it at the Sebring. He observed that the driver matched the physical description of the fugitive and also matched the photograph. *Id.* At that same time, the Sebring began to drive rapidly between the two police vehicles. *Id.* Deputy Habib was concerned that he would be hit by the Sebring and feared for his life and that of Deputy Ioos whom he believed was also in the path of the Sebring. *Id.* Habib fired three shots toward the Sebring, aiming at the driver. *Id.* at ¶ 13.

The Sebring sped away from the gas station, and Detective Kuriger and Deputy Habib pursued it while alerting the Task Force that shots had been fired and they were in pursuit. This was just after 12:00 a.m. on February 14, 2009. *Id.* at ¶ 14. Mr. Brewer said he soon saw a police car with flashing lights and immediately pulled over. [DE 32-2 at ¶ 21]. Other Task Force members stopped the Sebring. Deputy Habib states he was not involved in removing or arresting anyone in the Sebring, and that he was removed from the scene shortly thereafter. [Habib Declaration at ¶ 15]. Deputy Ioos also states he was not involved in the extraction or subsequent arrest of any individual in the Sebring. [Ioos Declaration at ¶ 9].

Deputy Ioos stated that, at the Thornton's, he had not stopped his vehicle when the Sebring quickly began to speed ahead. He thought the Sebring was actually going to hit his vehicle as it sped away. [Ioos Declaration at ¶ 7]. At the same time, he heard two or three shots and saw Detective Kuriger and Deputy Habib begin pursuit. He followed them and soon came upon the Sebring that had been stopped by other Task Force members. *Id.* at ¶ 8. It was later determined that the driver of the Sebring was not the fugitive, but was Marcus Brewer. Courtnie Pruitt, the female passenger, had been shot in the arm.

Plaintiffs' Complaint alleges they were in Louisville to celebrate Valentine's day and the first birthday of their son, Jaylen. [Complaint at ¶ 9]. Jaylen and Courtnie's seven-year-old daughter, Justice, were in the back seat of the vehicle. *Id.* at ¶¶ 9, 11. Plaintiffs allege they were looking for a hotel room. *Id.* at ¶ 10. When they parked at the Thornton's, two unmarked vehicles attempted to block them. *Id.* at ¶¶ 12-13. They allege the defendants, who were not in law enforcement

4

uniforms, jumped out of their vehicles with their guns drawn and pointed the guns at the Sebring occupants. *Id.* at ¶¶ 14-15. Plaintiffs thought they were being robbed and fled the parking lot, at which point they allege that the "Defendants fired at least three shots at Plaintiffs," one of which struck Courtnie Pruitt in the arm. *Id.* at ¶¶ 16-20.

Plaintiffs' Complaint further alleges that, after they were apprehended, "Defendants" threw Mr. Brewer to the ground with significant physical force and also threw Ms. Pruitt to the ground, ignored her pleas for help because she was pregnant and wounded, and refused to allow Mr. Brewer to go home with his children. *Id.* at ¶¶ 23-25. Plaintiffs Brewer and Pruitt allege they suffered physical and mental injuries and that their children suffered emotional injuries. *Id.* at ¶ 28.

In response to the motion for summary judgment, Plaintiffs provided the affidavits of Marcus Brewer and Courtnie Pruitt. In pertinent part, Brewer stated the following facts and conclusions:

> 5. While we were parked in the Thornton's lot, an SUV and van pulled into the lot. The SUV parked beside the driver's door. The van parked on the other side of the Sebring. The two vehicles left enough room for me to drive the Sebring between the two without striking either.
>
> 7. None of the individuals in either vehicle had on law enforcement uniforms or anything that identified them as law enforcement officers.
>
> 9. None of the officers said anything to identify themselves as law enforcement. None of the officers displayed a badge to us.
>
> 13. None of the defendants was ever in the path of my vehicle.
>
> 14. I did not come close to striking any of the defendants with my vehicle.
>
> 15. As I drove out of the parking lot, at least one of the defendants fired his gun at us.
>
> 16. At the time the shots were fired, the Sebring was well beyond the defendants, the SUV and the van. The shots came from behind the Sebring.
>
> 18. One bullet struck the Sebring near the gas tank.
>
> 19. One bullet went through the rear window of the Sebring. This bullet shattered the rear windshield, with glass falling all over the two children and the back seat. Both children received scratches and cuts. The bullet nearly missed the two children and struck Courtnie in the arm.

5

> 26. Defendants Habib, Ioos, and Kuriger conferred among themselves and with other officers and made the decision to charge me with Wanton Endangerment in the First Degree and Endangering the Welfare of a Minor.
>
> 29. On March 26, 2009, I went to Jefferson District Court. There was a preliminary hearing. The judge decided there was no probable cause for any of the charges against me and all charges were dismissed.

[DE 32-2].

Ms. Pruitt provided a virtually identical declaration, including an obvious mistaken repetition where it said: "The two vehicles left enough room for **me** to drive the Sebring between the two without striking either." [DE 32-3, emphasis added]. It is undisputed that Ms. Pruitt was **not** the driver of the Sebring.

## II.  ANALYSIS

### A.  Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving

party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

### B. Qualified Immunity

"The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including 'avoidance of disruptive discovery.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1953 (2009) (quoting *Siegert v. Gilley*, 500 U.S. 226, 236 (1991)). "When the defendant raises qualified immunity, the plaintiff bears the burden of proving that the defendant is not entitled to summary judgment." *Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008). Government officials may not be held vicariously liable under *Bevins*; therefore, a plaintiff must show "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S.Ct. at 1948.

### C. Plaintiffs' Search and Seizure Claims

In their Complaint, Plaintiffs lump all police officers together into a generic category of "Defendants." Plaintiffs have failed to present any evidence, however, that Deputies Habib or Ioos effected any seizure or search of the Plaintiffs after leaving the gas station.[1] The uncontradicted evidence is that other members of the Task Force apprehended the vehicle, removed the Plaintiffs, and arrested Brewer. Accordingly, Plaintiffs' Constitutional claims relating to events after leaving the gas station cannot result in individual liability for Habib or Ioos. A plaintiff must show that each official's own individual actions violated the Constitution. *Iqbal*, 129 S.Ct. at 1948; *see also Dorsey v. Barber*, 517 F.3d 389, 399, n. 4 (6th Cir. 2008) ("Each defendant's liability must be assessed individually, based on his or her own actions."). Plaintiffs failed to present evidence of individual unconstitutional conduct by Deputies Habib and Ioos in Plaintiffs' ultimate apprehension or search. Accordingly, these Defendants are entitled to summary judgment on those claims.

---

[1] Plaintiffs' claim of excessive force in seizing them is addressed separately below.

7

Plaintiffs rely on *Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999) to argue Habib and Ioos may be liable for the conduct of other officers under a vicarious liability theory. This argument is without merit. *Shehee* involved a claim of respondeat superior from a supervisor's failure to act. There is no such claim in this case. Moreover, *Iqbal* clearly says "vicarious liability is inapplicable to *Bivens* and § 1983 suits." *Iqbal*, 129 S.Ct. at 1948.

Plaintiffs' response to the summary judgment motion clarifies that "liability for this claim is based on the seizure of Pruitt by Habib when he shot her, not the subsequent search of her person." [DE 32, p. 11]. If there was probable cause to seize the occupants, there was no constitutional violation unless excessive force was used. As previously noted, Plaintiffs' excessive force claim is addressed separately below.

To the extent Plaintiffs claim that the attempt at the gas station to block their vehicle was an unconstitutional seizure, that claim also fails. "When an officer has 'reasonable suspicion' that criminal activity may be afoot, the officer may conduct a limited seizure and briefly detain a person for investigative purposes." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008), citing *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). "Reasonable suspicion":

> requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry stop.*

*Smoak v. Hall*, 460 F.3d 768, 778-79 (6th Cir. 2006).

> In examining the totality of the circumstances, it is important to note that the officer's reasonable suspicion need not arise exclusively from his own direct observations. Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers.

*Dorsey*, 517 F.3d at 395.

It is undisputed that the Task Force had surveillance information that an armed and extremely dangerous fugitive was in the vicinity of the Ramada Inn on Crittenden Drive, was likely to be driving a rental car, and may have his girlfriend with him. They observed a rental vehicle at

the Ramada Inn with a female passenger, and Detective Kuriger, who was familiar with the suspect, identified the driver as the suspect fugitive. Deputy Habib said the driver matched a photograph of the suspect provided to the Task Force.[2] The vehicle drove in and out of a couple of hotel parking lots, a Budget Car Rental lot and into a Thornton's, but no one ever left the vehicle. Based upon the information provided by others and their own observations, the officers decided to stop the vehicle and question the occupants. [Habib Declaration ¶ 8]. At this point, the officers unquestionably had "a sufficient factual basis for thinking that they were acting consistently with *Terry*." *Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003). Moreover, there is no evidence that the information upon which the officers relied was flawed in any way; thus, there was no Fourth Amendment violation in attempting to stop the vehicle. Even if there were a Fourth Amendment violation, the officers would be entitled to qualified immunity as the attempted stop was based on reasonable suspicion. *Id.*

Once Marcus Brewer decided to escape in a hurry between the two vehicles, the situation changed significantly. Deputy Habib said: "the Chrysler Sebring began to rapidly drive towards me. I was concerned that I was going to be hit by the Chrysler Sebring and feared for my life and the safety of Deputy Ioos who I believed was also in the path of the Sebring." [Habib Declaration ¶ 12]. Deputy Ioos said: "While I was coming to a stop, the Chrysler Sebring began to quickly speed away. I thought the Chrysler Sebring was going to actually hit my vehicle as it sped away." [Ioos Declaration ¶ 7]. Detective Kuriger filed a post-arrest complaint stating in part: "when police approached vehicle above [Brewer] took off recklessly between the police vehicles with an officer between these vehicles." "Also, another [officer's] vehicle was close to being hit." [DE 28-1].

---

[2] While copies of two photographs and a schematic of the vehicle location are included in Defendants' memorandum, the Court cannot consider these items, as the officers' affidavits did not identify the photographs or the schematic. Unsworn documents or reports cannot be considered in a motion for summary judgment. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 480 (6th Cir. 2008). The Court may consider, however, the officers' sworn statements regarding their use of the suspect's photograph.

Brewer states in a conclusory fashion that the defendants were not "in the path of my vehicle" and that he "did not come close to striking any of the defendants with my vehicle." [DE 32-2 at ¶ 13]. Brewer's admissions about the incident, however, are inconsistent with his conclusory opinions. Brewer admits that the van was parked on the passenger side of the Sebring, that the officers [Kuriger and Habib] jumped out of the van, that Habib pointed a gun at him, and that Brewer escaped by driving the Sebring between the van and the SUV, which was on the Sebring's driver's side. *Id.* at ¶¶ 5, 8, 12. Brewer does not claim that Habib ducked behind the van or otherwise was shielded as he got out and pointed the gun at Brewer. Habib said he was approaching the Sebring. [Habib Declaration at ¶ 12]. Habib had been a passenger in the van, and his only probable location was standing between the van and the Sebring as the Sebring threaded its way between the van and the SUV. There is a factual question as to how close the Sebring came to striking Deputy Habib or Deputy Ioos' vehicle, but Brewer's conclusory opinions about his "path" and "not close" do not refute the other evidence of record, even when that evidence is viewed in the light most favorable to the Plaintiffs. A court is not required to accept as true a statement that is not supported by the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The officers had reason to believe they were apprehending a fugitive who was considered armed and extremely dangerous. Brewer's flight gave the officers even more reason to believe that a criminal offense has been or is being committed and that Brewer should be apprehended. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). *See also Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008) ("Evading a police officer cannot be dismissed as a minor traffic violation, and Dunn's conduct in fleeing gave the officers reason to be especially suspicious of Dunn once he finally did pull over."). It is the Opinion of this Court that the officers had probable cause to stop and apprehend the occupants of the Sebring. Accordingly, summary judgment will be granted in favor of Deputies

Habib and Ioos on Plaintiffs' claims of unconstitutional search and seizure outside of the context of the claim of excessive force.

### D. Malicious Prosecution

Plaintiffs contend that Deputies Habib and Ioos should be liable for malicious prosecution because the charges filed against Mr. Brewer were dismissed by the state district court. Plaintiffs' Complaint alleges that "Defendants charged Marcus Brewer with Wanton Endangerment in the First degree and Endangering the Welfare of a Minor." [Complaint ¶ 26]. It further alleges that the "court found no probable cause for the charges against Mr. Brewer and all charges were dismissed." *Id. at ¶ 27.* In response to the motion for summary judgment, Plaintiff said: "Defendants Habib, Ioos, and Kuriger conferred among themselves and with other officers and made the decision to charge me with Wanton Endangerment in the First Degree and Endangering the Welfare of a Minor." [DE 32-2 at ¶ 26].

"Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must show that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009). General allegations against multiple defendants fail to state a claim. Moreover, the "charges" against Brewer were brought in state court by a state prosecutor and not by the federal law enforcement officers.

Additionally, the Uniform Citation giving rise to Brewer's arrest and the charges against him was based upon witness statements by LMPD Detective Kuriger. [DE 28-1]. Deputies Habib and Ioos are listed as "victims." Detective Kuriger was driving the van containing Deputy Habib and was in a position to observe Brewer's behavior at the Thornton's station. Kuriger said Brewer "took off recklessly between the police vehicles with an officer between these vehicles" and that Brewer "admitted to taking off between vehicles." Kuriger said "another officer's vehicle was close to being hit." Kuriger also noted that children ages seven and eleven months were in the vehicle. *Id.* The

fact that Deputies Habib and Ioos may have "conferred" with Detective Kuriger regarding the possible charges against Brewer is not enough to state a claim for malicious prosecution.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. ... Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Iqbal*, 129 S.Ct. at 1949, quoting *Bell Atlantic Corp. Twombly*, 550 U.S. 544, 556-557 (2007). Merely conferring about charges does not make a claim of malicious prosecution plausible.

In the response to summary judgment, counsel argues that "[a]t a minimum, they [the Defendants] provided the false information to another officer causing Brewer to be charged." [DE 22 at 13]. There is no admissible factual evidence to support this argument. There is no evidence that Habib or Ioos provided false information to anyone, much less that it caused Brewer to be charged.

The conclusory opinions by Brewer and Pruitt that the Defendants were not in the path of the vehicle and that it did not come close to striking any of the Defendants do not refute Kuriger's statements on the citation that Brewer "took off recklessly between the police vehicles with an officer between those vehicles" and with two young children in the car. In *Hartman v. Moore*, 547 U.S. 250, 262-63 (2006), the following cases were cited as examples of the showing required for a claim of malicious prosecution: *Barts v. Joyner*, 865 F.2d 1187, 1195 (11th Cir. 1989) (plaintiff seeking damages incident to her criminal prosecution would have to show that the police, who allegedly acted in violation of law in securing her arrest, unduly pressured or deceived prosecutors); *Dellums v. Powell*, 566 F.2d 167, 192-193 (D.C. Cir. 1997) (where allegation of misconduct is directed at police, a malicious-prosecution claim cannot stand if the decision made by the prosecutor to bring criminal charges was independent of any pressure exerted by police); *Smiddy v. Varney*, 665 F.2d 261, 267 (9th Cir. 1981) ("[W]here police officers do not act maliciously or with

12

reckless disregard for the rights of an arrested person, they are not liable for damages suffered by the arrested person after a district attorney files charges unless the presumption of independent judgment by the district attorney is rebutted"). Plaintiffs' complaint and affidavits do not come close to these requirements. Summary judgment will be granted in favor of Deputies Habib and Ioos on Plaintiffs' claim of malicious prosecution.

### E. Excessive Force Claims

A court may consider the question of qualified immunity, without first determining whether there was a constitutional violation. *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009). Plaintiffs claim their Constitutional rights were violated when Deputy Marshal Habib fired three shots at their vehicle. When qualified immunity has been raised, the "proper inquiry on a defendants' motion for summary judgment is whether, after considering the facts in the light most favorable to the plaintiffs, a rational jury could find that [the defendant's] use of deadly force against [the plaintiffs] was objectively reasonable." *Williams v. City of Grosse Ponte Park*, 496 F.3d 482, 485 (6th Cir. 2006). In *Brosseau v. Haugen*, 543 U.S. 194 (2004), the court summarized the principles governing Fourth Amendment excessive force cases as follows:

> [T]he constitutional question ... is governed by the principles enunciated in *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Conner*, 490 U.S. 386 (1989). These cases establish that claims of excessive force are to be judged under the Fourth Amendment's "objective reasonableness" standard. Specifically with regard to deadly force, we explained in *Garner* that it is unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead." But "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."

*Id.* at 197-98 (quoting *Garner*, 471 U.S. at 11). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that

is necessary in a particular situation." *Id.* at 396-97. Determining whether a particular use of force is reasonable "requires careful attention to the facts and circumstances of each particular case, including:" (1) "the severity of the crime at issue," (2) the immediacy of the threat posed by the suspect to the officers or others, and (3) whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." *Williams*, 496 F.3d at 486 (quoting *Graham*, 490 U.S. at 396). There are no special preconditions when an officer's actions constitute "deadly force." "[I]n the end we must still slosh our way through the factbound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007).

Although no two cases are factually identical, there are several recent cases that shed light on the present one. In *Brosseau v. Haugen*, 543 U.S. 194 (2004), Officer Brosseau responded to a report of men fighting in Haugen's mother's yard and had prior information that there was a felony no-bail warrant out for Haugen on drug charges. *Id.* at 194. Brosseau's arrival created a distraction, and Haugen was able to get away. Officers with a K-9 unit searched for 30-45 minutes, and a neighbor then reported a man in her back yard. As Officer Brosseau approached, Haugen appeared, ran to his Jeep in his mother's driveway, jumped in and locked the door. Haugen's girlfriend and three-year-old daughter were in a small car parked between the Jeep and the street. Brosseau pointed her gun at Haugen and ordered him out of the Jeep. Haugen ignored her commands and was not deterred when she broke the car window and struck Haugen with the butt of her gun. Then he started the car and began to move. Brosseau jumped back and fired one shot through the rear driver's-side window at a forward angle, hitting Haugen in the back. Haugen swerved across a lawn and continued down the street until he realized he had been shot, at which point he brought the Jeep to a halt. *Id.* at 196-97.

The United States Supreme Court rejected Haugen's claim of an unconstitutional seizure through the use of excessive force and reversed the Ninth Circuit's denial of qualified immunity. It said: "[i]f the law at that time did not clearly establish that the officer's conduct would violate the

Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau*, 543 U.S. at 198. The court discussed several cases in which the officers had probable cause to believe a vehicle "posed an imminent threat of serious physical harm to innocent motorists as well as to the officers themselves" and fired shots to stop the fleeing vehicle. *Id.* at 600, citing *Cole v. Bone*, 993 F.2d 1328 (8th Cir. 1993); *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992). *Brosseau* noted the holding in *Freland* that "a car can be a deadly weapon." *Id.* "In these cases, the courts found no Fourth Amendment violation." *Id.* Accordingly, it was not "clearly established" that Brosseau's conduct violated the Fourth Amendment.

In *Williams v. City of Grosse Point Park*, 496 F.3d 482 (6th Cir. 2007), Officers Miller and Hoshaw were advised that three individuals in a green Dodge Shadow were tampering with cars. They came upon a green Dodge Shadow with three occupants and subsequently determined the Shadow had been reported stolen. Hoshaw positioned his cruiser in front of the Shadow to block its path, while Miller approached from the rear. Williams put the Shadow in reverse and collided with Miller's cruiser. Hoshaw exited his cruiser, brandished his weapon, approached the Shadow and stuck his gun in the driver's side window at Williams' head. Williams accelerated to move around Hoshaw's cruiser and flee. Hoshaw kept his grasp on the car and was knocked down. Miller fired several rounds as the car moved away, and one shot struck Williams in the back of the neck, leaving him paralyzed. *Id.* at 484.

In analyzing the officers' conduct, the court said:

> At the point Miller fired his weapon, he was faced with a difficult choice: (1) use deadly force to apprehend a suspect who had demonstrated a willingness to risk the injury of others in order to escape; or (2) allow Williams to flee, give chase, and take the chance that Williams would further injure Sgt. Hoshaw or an innocent civilian in his efforts to avoid capture. Moreover, Miller had only an instant in which to settle on a course of action. Under the circumstances, we cannot say that Miller acted unreasonably, nor do we believe that a rational juror could conclude otherwise.

*Id.* at 486. In reviewing the *Graham* factors, the court said: "While the suspected crime was a nonviolent property offense, the immediate threat Williams posed to Hoshaw and other drivers and

15

pedestrians and the fact that Williams elected to flee both suggest that Miller's chosen use of force to apprehend Williams was reasonable." *Id.* at 487.

In *Scott v. Clay County, Tennessee*, 205 F.3d 867 (6th Cir. 2000), Robert Scott was driving a Chevrolet Caprice belonging to his ex-wife, Patricia, with her as his passenger, after he had "proximately ingested a significant volume of alcohol coupled with additional psychoactive substances." *Id.* at 871. Deputy Sheriff Thompson observed the Caprice disregard a stop sign, make a reckless turn and then proceed at high speed, narrowly missing the Sheriff's unmarked cruiser parked near the roadside. Thompson pursued the Caprice with siren sounding and blue lights flashing. Roberts sought to evade apprehension because his driver's license had been revoked for driving while intoxicated. During his flight, Roberts forced one motorist off the roadway and "could have been sliding across the yellow line." *Id.* at 871-72. Two additional sheriff's units joined the chase for over twenty minutes, when Roberts lost control of the Caprice while making a sharp turn and skidded into a roadside guardrail. Deputy Pierce parked near the Caprice, exited his patrol car, produced his service arm and cautiously moved toward the vehicle. Suddenly the Caprice "rapidly accelerated forward, compelling Pierce to leap out of its path." As it attempted to return to the highway, the Caprice proceeded directly toward Thompson's approaching vehicle. Deputy Pierce fired five bullets towards Roberts and then an additional four rounds at the vehicle's tires, causing it to skid to a stop. Roberts was not hit, but Patricia was struck by two bullets.

In response to Patricia's complaint of the unconstitutional use of excessive force to seize her, the law enforcement officers moved for summary judgment based on qualified immunity. *Id.* at 873-74. The trial court denied the motion, but the Sixth Circuit reversed and granted summary judgment in favor of the officers. In analyzing the *Graham* factors, it said:

> First, Roberts had committed serious, life-threatening crimes in the presence of the defendant officers. Second, the record proof demonstrated that the fleeing motorist's ongoing felonious misconduct posed an immediate threat to the safety of officers as well as innocent civilians. Third, the vehicular perpetrator was actively resisting arrest by eluding representatives of the criminal justice system.

*Id.* at 877. "[T]he testimonial proof, encapsulated herein, would warrant a reasonable officer in Pierce's circumstances to conclude that the culprit posed a serious risk of injury to others, which, standing alone, reconciled his use of force with Fourth Amendment strictures." *Id.* With respect to Patricia, the court said:

> Pierce justifiably fired at the fleeing vehicle in order to seize its occupant(s); his actions therefore could not violate the Fourth Amendment rights of any unknown passenger who may have been injured by his actions. Thus, Pierce is entitled to qualified immunity because he did not impinge the plaintiff's constitutional rights.

*Id.* at 878. *See also Smith v. Freland*, 954 F.2d 343, 346-48 (6th Cir. 1992) (Officer's conduct was constitutionally reasonable following high speed chase and subject vehicle accelerating into officer's cruiser and proceeding toward public street when "officer fired a fatal round at the mobile offender.").

When the *Graham* factors, which determine whether a particular use of force is reasonable, are applied to the facts of the case, the result is mixed. The first factor, the severity of the crime, is clear. The officers had probable cause to believe they were dealing with an armed and extremely dangerous individual who had an open arrest warrant. The record would be even clearer if the photographs were admitted to show the reasonableness of the officers' perception of Brewer as the suspect.

The third *Graham* factor is a little more troublesome. Because the cars were unmarked and the officers were not in uniform, it is less clear that it was objectively reasonable for the officers to believe the suspect was "actively resisting arrest or attempting to evade arrest by flight." Deputy Habib said he had his U.S. Marshal's badge hanging from around his neck and that he yelled, "Police, let me see your hands." Brewer said "[n]one of the individuals in either vehicle had on ... anything that identified them as law enforcement officers" and "[n]one of the officers said anything to identify themselves as law enforcement." Resolution of these factual conflicts may assist in determining the reasonableness of the officers' actions when Brewer began to flee.

Also is not clear from the record before this Court is "the immediacy of the threat posed by the suspect to the officers or others." The schematic of the position of the vehicles is not in the record. There is no evidence regarding any of the distances involved or where the officers were located, particularly Deputy Habib. There is no evidence regarding any other persons in the Thornton's lot, the typical vehicle or pedestrian traffic on Crittenden Drive, or any other persons whose safety may have been threatened. There is no evidence of the position of the Sebring when the shots were fired.

Because the Plaintiffs' statements present factual questions on these issues, the Court will grant Plaintiffs' motion for discovery in part, but the discovery shall be limited to the factual issues discussed in this Opinion, unless the United States consents to additional discovery.

### III. CONCLUSION

**IT IS ORDERED:**

1. The motion of Deputy Marshals Habib and Ioos for summary judgment DE 18] is **GRANTED IN PART**. Summary judgment in favor of Habib and Ioos is granted on all constitutional issues except the claim of the use of excessive force; and

2. Plaintiffs' motion to permit discovery [DE 33] is **GRANTED IN PART**, but is limited to whether is was reasonable for the officers to believe that Brewer was "actively resisting arrest or attempting to evade arrest by flight" and whether there was an immediate "threat posed by the suspect to the officers or others."

This January 11, 2011.



Signed By:
*Karl S. Forester* KSF
**United States Senior Judge**